UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CASE NO. 4:07-CV-86

**LARRY HIGDON**                                                                                 **PLAINTIFF**

**V.**

**SUN LIFE ASSURANCE CO.**
**OF CANADA**                                                                                 **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on motions for judgment on the administrative record by both Plaintiff Larry Higdon [DN 29] and Defendant Sun Life Assurance Co. of Canada [DN 28]. Fully briefed, this matter is ripe for consideration. For the following reasons, the Plaintiff's motion for judgment on the record is **GRANTED** and the Defendant's motion for judgment on the record is **DENIED**.

**I. FACTS**

Plaintiff Larry Higdon began working at Daramic LLC ("Daramic") in Owensboro, Kentucky, in December 1999. Mr. Higdon worked as Re-inspect Finishing Operator at Daramic, which involved setting up and operating machines which combined two or more sheets of material to form laminated products. As Re-Inspect Finishing Operator, Mr. Higdon was required to stand and/or walk for 8 hours each and to use his hands for seizing, holding, and grasping. He was also required to bend and stoop continuously, reach above shoulder level, kneel, balance, and to push, pull, lift and carry 25-70 pounds. (Employer Statement, SL 76-78).

Daramic was the sponsor of an employee benefit plan that provided long-term disability ("LTD") benefits to eligible employees through a policy issued by the Defendant, Sun Life Assurance Company of Canada ("Sun Life"). Under Sun Life's long-term disability policy (the

"Policy"), Sun Life agreed to pay monthly LTD benefits to plan participants who become "Totally Disabled." The Policy defines "Totally Disabled" to mean that "during the Elimination Period and the next 60 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation." (Sun Life Policy, SL 448). The Policy also provides that Sun Life "must receive Notice and Proof of Claim prior to any payment under this Policy." (Id., SL 474). The Policy goes on to state that "Proof of Claim must consist of: a description of the disability; the date the disability occurred; and the cause of the disability." (Id.)

The Plaintiff stopped working at Daramic on March 25, 2005 because he was suffering from tingling in his hands, arms, and feet; extreme stiffness in his shoulder and neck; heat sensitivity; and "memory problems." (SL 80). On September 14, 2005, he applied for long-term disability benefits under the Sun Life Policy. He subsequently sent Sun Life medical records from his treating physician, Dr. Johnson; his orthopedist, Dr. Moore; a neurologist, Dr. Chester Higdon; and a neuropsychologist, Jeff Gray, Ph. D.

The records that Sun Life received from Mr. Higdon's orthopedist, Dr. Moore, indicate that Mr. Higdon went to see Dr. Moore on April 19, 2005, because he was suffering from chronic left shoulder pain which radiated down Mr. Higdon's arm and into his wrist. Following an examination, Dr. Moore concluded that "[Mr. Higdon's] shoulder pain does not appear to be intrinsic shoulder pathology. The posterior scapular pain with radiation down his arm is more commonly neurologic in etiology." Accordingly, Dr. Moore ordered electrodiagnostic studies of Mr. Higdon's upper arm "to see if there is evidence of nerve pathology;" MRI testing; and a chest x-ray. (SL 146). Neither the MRI of his spine nor the chest x-ray revealed the cause of Mr. Higdon's symptoms. The MRI of Mr. Higdon's brain revealed "three tiny areas of abnormal white matter." The interpreting

radiologist noted the lesions but concluded that "while a demyelinating process is a possibility, normal variation or early small vessel disease are far more likely considerations." (SL 116). Based on these inconclusive test results, Dr. Moore referred Mr. Higdon to Dr. Chester Higdon, a neurologist. (SL 144).

Dr. Higdon examined Mr. Higdon on July 1, 2005. Based upon his examination of Mr. Higdon and a consideration of his symptoms and prior test results, Dr. Higdon concluded that "the patient has prominent subjective complaints that potentially reminiscent [sic] of demyelinating disease and has questionable abnormalities on his MRI scan...In the present situation, it may be best to proceed on with a lumber puncture to exclude demyelinating disease." (SL 130-131). Mr. Higdon underwent the lumbar procedure, and in a subsequent record, Dr. Higdon wrote: "He had some questionable abnormalities on his evoked response and his MRI scan might have suggested demyelinating disease...His spinal fluid, however, is entirely normal for demyelinating disease." (SL 220). Dr. Higdon concluded: "I do not find evidence for primary neuromuscular disease. Given the variable nature of his complaints and the wide range of complaints, one would have to consider possible conversion reaction. My suggestion would be that he see his new primary care physician and if these complaints are not felt to be subjective in origin the consideration be given to referral to a major medical center for additional evaluation." (SL 221).

Dr. Johnson first saw Mr. Higdon on August 12, 2005. Dr. Johnon's medical records reveal that by time Mr. Higdon had been off for several months and had seen, in addition to the physicians mentioned above, both a chiropractor and a pain management specialist, Dr. Suki Kim, for neck and back pain. Dr. Johnson noted that Mr. Higdon reported that he suffered from severe back pain, tingling in his arms, eye pain, poor memory, judgment, fatigue, discoordination, and depression. Dr.

Johnson also wrote that Mr. Higdon has been "worked up for MS," but that "apparently his spinal fluid was unremarkable." (SL 113). In his August 25, 2008 notes, Dr. Johnson concluded that Mr. Higdon was suffering from peripheral neuropathy and/or myalgia. He writes: "I really think symptoms somewhat fit fibromyalgia especially with cognitive deficits....He is to remain off work." (SL 111). Dr. Johnson also placed Mr. Higdon on Effexor, which is an antidepressant, and Lyrica, which is used to treat seizures, nerve pain, and fibromyalgia.

On October 25, 2005, Dr. Johnson completed an Attending Physician Statement for Sun Life. In the statement, he wrote that he had diagnosed Mr. Higdon with peripheral neuropathy, blurred vision, and myalgia. He noted that Mr. Higdon's subjective symptoms included neck pain, upper back pain, discoordination, blurred vision, tingling in his arms and his legs, and no energy. He also placed the following restrictions on Mr. Hidgon: no standing or walking, sitting and driving for only 1-3 hours/ day; no firm grasping, no fine manipulating. He stated that Mr. Higdon's physical impairment level was "severe" - meaning that he was "incapable of minium (sedentary) activity." He also noted that Mr. Higdon had tremors in his upper and lower limbs. (SL 161-163). Finally, in his notes from a December 19, 2005, office visit, Dr. Johnson wrote that Mr. Higdon's peripheral neuropathy and myalgia (of unknown etiology) continue "to affect his memory and with autonomic dysfunction. I do not think there is any way he can work. We are making his life tolerable with medication." (SL 192).

Finally, Sun Life also received a report from Jeff Gray, Ph.D., a neuropsychologist who examined Mr. Higdon on January 17, 2006. In this report, Dr. Gray concluded that Mr. Higdon had neurocognitive deficits. He summarized his finding as follows:

> [The] data overall were consistent with a moderate degree of cerebral compromise. As far as the specific etiology here, this is somewhat difficult however

4

> one wonders about the possibility of fibromyalgia related neurocognitive deficits...There is some indication that MS was apparently ruled out however as I understand it, his MRI did show some white matter lesion...Whatever the specific etiology, this patient does present with neurocognitive deficits that would seem to go beyond pseudodementia....As far as this gentleman's ability to consistently perform work-related types of tasks, he really does not have the neurocognitive abilities to do complex or detailed types of tasks. He has the gross intellectual abilities to do very simple repetitive types of tasks but because of his neurocognitive deficits taken in conjunction with his depression, his ability to even do these tasks at this point would appear to be compromised. He would at this point appear to be someone who would have a great deal of difficulty consistently handling work-like stresses, be very reliable and very independent secondary to a combination of his neurocognitive and psychological status. He would have a difficult time with persistence and pace...He would be able to remember some work rules but would have difficulty problem solving at this point.

(SL 170).

On March 9, 2006, Sun Life denied Mr. Higdon's application for long-term disability benefits . (SL 229-234). In the denial letter, Sun Life stated that its medical consultant had opined that "although [Mr. Higdon] [has] complaints that are consistent with fibromyalgia, sleep disturbances and depression, the testing that has been done to date does not support a definitive diagnosis." (SL 233) The letter also stated that Sun Life's consulting psychologist believed that "Dr. Gray's evaluation was compromised by lack of objective measure of effort...[and that Mr. Higdon]'s low performance on neuropsychological tests is likely due to his low average baseline IQ compounded by his current severe depression."[1]  Thus, Sun Life concluded that Mr. Higdon did not qualify for long- term disability benefits because "the medical evidence does not substantiate the severity and extent of [his] depression or any other medical limiting condition(s) or related

---

[1] Because Dr. Higdon had suggested that Mr. Hidgon's physical symptoms could be the result of "conversion reaction" (SL 221)and because Dr. Gray had opined that Mr. Higdon's depression could be affecting his neurocognitive status (SL 170), Sun Life considered whether the condition that formed the basis for Mr. Higdon's claim for disability insurance was a psychological one. In its denial letter, Sun Life concluded that Mr. Higdon was not eligible for disability benefits based on depression because he was not under the care of a specialist in psychiatric care as required by the Sun Life Policy. (SL 233).

5

impairment(s) that would preclude [him] from performing the material and substantial duties of [his] occupation as a Re-Inspect Finishing Operator on a full time basis." (SL 233). The letter did, however, advise Mr. Higdon of his right to appeal the denial and to submit additional documents and records relating to his claim for benefits.

Shortly thereafter, Mr. Higdon appealed Sun Life's decision to deny his long-term disablity benefits. He submitted additional medical records and an affidavit from Dr. Johnson; the result of another MRI of his brain; the report of Dr. Hunter, another neurologist; and a Notice of Award from the Social Security Administration.

The additional medical records submitted by Dr. Johnson followed Dr. Johnson's treatment of Mr. Higdon from February 2006 through June 2006. In his February records, Dr. Johnson noted that "Mr. Higdon is impaired to the point that he still cannot go back to work. I am not sure that he will ever be able to go back to work." (SL 267). Dr. Johnson's medical records from March 21, 2006, state that Mr. Higdon was having "jerking, spontaneous movements, especially when he is in the shower and there is a temperature change but he also has them during the day." (SL 260). He again writes: "[Mr. Higdon]'s cognitive impairment prevents him from working. He is not any better and he cannot return to work at this time. He would be in danger to himself. " (Id.) Additionally, Dr. Johnson's medical records from June 2006 state that Mr. Hidgon is suffering from cognitive impairment, peripheral neuropathy, myalgia, chronic fatigue, and parasthesia[2]. They also reflect that Dr. Johnson ordered another "MRI of his head as it has been one year to see if these lesions have progressed." (SL 254). Mr. Higdon had the MRI on June 6, 2006 and the interpreting radiologist

---

[2]Paresthesia refers to a burning or prickling sensation in the hands, arms, legs or feet. When symptoms of paresthesia are reported, diagnosis is attempted to ascertain the underlying cause which can be, inter alia, a disease or disorder of the brain, spinal cord or peripheral nerves.

noted that Mr. Higdon had "several tiny bilateral hemispheric white matter lesions, some of which may be new, though this is not absolutely certain..." (SL 255-256). Finally, in affidavit executed on July 31, 2006, Dr. Johnson stated:

> Based on my review of Mr. Higdon's medical records, and my contact with [him], he should be restricted from working a full time sedentary job...Currently, it is my opinion that Mr. Higdon probably suffers from multiple sclerosis. As of now he has had 2 or more attacks and does [sic] objective clinical evidence of 2 or more lesions in his brain. I believe that there are several different types of Diagnostic Criteria for Multiple Sclerosis; therefore I will leave the final diagnosis to the specialist. I have referred Mr. Higdon to an MS specialist, who is not able to see him until October 2006. Mr. Higdon's records currently give the appearance of MS attacks. For example he suffers from the following symptoms, which often vary in variety: poor tolerance of heat; poor bodily coordination; fatigue on light exertion; general dizziness; being a slow speaker, searching for words; emotional instability (depressed or flat affect most of the time with peaks of frustration; hand and arm tremors; muscle cramp/twitching; numb/tingling/burning sometimes in feet. *I have personally observed many of these problems.* In addition, Mr. Higdon has marked mental limitations resulting from these organic changes in his brain.

(SL 280)(emphasis added).

Dr. Hunter, the neurologist, examined Mr. Higdon on September 20, 2006 and reviewed his MRIs. His report states: "Impression: 1. Leukoencephalopahty - demyelinating vs. microsvascular diseases suggest demyelination; 2. Multilevel disc disease; 3. Myofascial pain; 4. Cognitive impairment; 5. Gait ataxia; 6. Diplopia, horizontal; and 7. Fatigue, intractable...Plan: 1. Repeat MRI of C-SPine on MS protocol...." (SL 402). [3]

Finally, Sun Life also received Mr. Higdon's notice of award from the Social Security Administration and one of the reports upon which the SSA's decision to award disability benefits was based. (SL 303-330). The report was completed by Ann Hess, Ph.D., a medical consultant for

---

[3] On October 16, 2006, Sun Life officially denied Mr. Higdon's appeal. In October 24, 2006, Dr. Higdon evaluated the results of Mr. Higdon's repeat MRI and concluded that he suffered from "clinically definite multiple sclerosis." (SL 388-392).

7

the SSA. She concluded that Mr. Higdon's medical records established that he had an organic mental disorder which was evidenced by memory impairment and the he had a "medically determinable impairment" due to a cognitive disorder. (SL 318). She also concluded that he suffered from "prominent depression and anxiety" which further compromised his abilities. (SL 315). Finally, she opined that Mr. Higdon's mental disorders caused him to be "moderately" limited in his daily living activities, social functioning, and concentration, persistence, and pace. (SL 327).

After reviewing these medical records, Sun Life informed Mr. Higdon on October 16, 2006 that "[i]t has been determined that the denial of [his] claim was appropriate and will not be altered." (SL 377). Sun Life informed Mr. Higdon that this decision was based upon the medical information in his file, including the information submitted on appeal, and the review of such information by two individuals who consult for Sun Life: Dr. William Hall, an internal medicine specialist, and Michael Raymond, Ph.D., a neuropsychologist.

Dr. Hall's analysis and conclusions were as follows: "Dr. Johnson's physical and neurological examinations of Larry Higdon through nearly one year have consistently been within normal limits. Physical or laboratory signs of progressive disease (weight loss, fever, diminished skeletal mass, objective weakness, pallor, anemia, hypoalbuminemia) are not identified....Medical records available for Larry Higdon do not reference activities prevented, delayed or interrupted by medically limiting illness. Consultative evaluations and diagnostic studies to confirm or exclude diagnoses of multiple sclerosis, peripheral neuropathy, orthopedic pathology, autoimmune disorders, obstructive sleep apnea and other chest disorders have not identified medically limiting illnesses...Medical records available for review do not identify an objective medically limiting illness with which to support an impediment to Larry Higdon pursuing sustained ordinary activities

including work at his usual level of exertion." (SL 378).

The denial letter then states that based upon this medical review, "it does not appear as though [Mr. Higdon's subjective] complaints would prevent Mr. Higdon from physically performing at the activity level he did prior to March 25, 2005. As such the presence of a medical condition of a nature and severity such that Mr. Higdon cannot perform his own occupation is not established." (Id.)

The letter then goes on to state that Mr. Higdon's file was also reviewed by neuropsychologist Michael Raymond, Ph.D. Upon his review of Dr. Gray's neuropsychological evaluation of Mr. Higdon, Dr. Raymond opined: "Dr. Gray's...evaluation must be considered somewhat cursory and non-standardized...Dr. Gray indicated that Mr. Higdon's neuropsychological test findings were 'consistent with at least diffuse moderate moderate neuropsychological impairment with no clear focal signs noted.' There was no etiology noted within the medical records to support diffuse neuropsychological impairments. Thus, without a confirming etiology, one must suspect that Mr. Higdon's generalized cognitive inefficiency was chronic and more consistent with his borderline level of general cognitive functioning....Based on the above noted medical record review...Mr. Higdon's etiology remains unclear, as does the reason for his disability status." (SL 379-380).

The denial letter then concludes as follows: "Based upon the medical evidence on file, there does not appear to be a change or worsening in Mr. Higdon's functioning both physically or mentally as of March 25, 2005 that left him no longer able to perform at the level he was performing at prior to that date. For this reason, he does not satisfy the policy definition of "Total Disability" and no benefits are due." (SL 380).

After being notified that his appeal had been denied, Mr. Higdon brought the action that is now before the Court. Three months after Sun Life issued this decision, Mr. Higdon submitted medical records establishing that he had been diagnosed with multiple sclerosis.

## II. STANDARD OF REVIEW

A denial of benefits challenged under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, et seq., is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan. Williams v. International Paper, 227 F.3d 706, 710 (6th Cir. 2000). Where an ERISA plan expressly affords discretion to trustees to make benefit determinations, a reviewing court should apply the arbitrary and capricious standard to the administrator's actions. Id. at 711. Here, both parties have agreed that the "arbitrary and capricious standard" is appropriate. (See DN 27).

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. Id. at 712; Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1993). When applying the arbitrary and capricious standard, a court must decide whether the plan administrator's decision was "rational in light of the plan's provisions." Williams, 227 F.3d at 712 (quoting Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1998)). Accordingly, where it is "possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Williams, 227 F.3d at 712 (quoting Davis, 887 F.2d at 693). Stated differently, if the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," the decision will be upheld. Elliott v. Metro Life Ins. Co., 473 F.3d 613, 617 (6th Cir. 2006).

Despite this deferential standard, however, the court's review is no mere formality. The arbitrary and capricious standard does not require the court merely to rubber stamp the administrator's decision. Instead, the court is required to review the quality and quantity of the medical evidence and the opinions on both sides of the issues. Glenn v. MetLife. 461 F.3d 660, 666 (6th Cir. 2006).

### III. ANALYSIS

The Court must determine whether Sun Life's decision that Mr. Higdon was able "to perform the material and substantial duties of his own occupation" - as a Re-Inspect Finishing Operator - is supported by substantial evidence and was the result of a "deliberate, principled reasoning process." As noted above, as a Re-Inspect Finishing Operator, Mr. Higdon was required to stand and/or walk for 8 hours each and to use his hands for seizing, holding, and grasping. He was also required to bend and stoop continuously, reach above shoulder level, kneel, balance, and to push, pull, lift and carry 25-70 pounds. (Employer Statement, SL 76-78).  This position also requires the "ability to apply common sense understanding to carry out instructions furnished in written, oral, or diagrammatic form...and to deal with problems involving several concrete variables in or from standardized situations." (Daramic Job Description, SL 296-298).  As noted above, Mr. Higdon's primary care physician concluded, even though he was unable to offer a definite diagnosis, that based upon his multiple physical examinations of Mr. Hidgon, Mr. Higdon was physically and mentally unable to perform the material duties of his position. (See Attending Physician Statement, SL 161-163). Similarly, Dr. Gray, the neuropsychologist who examined Mr. Higdon, concluded that although the cause was unclear, Mr. Higdon had neurocognitive deficits that would make it extremely difficult for him to work. (SL 170). Despite the opinions of these treating physicians, Sun

11

Life denied Mr. Higdon's application for long-term disability benefits because there was no objective medical data supporting the severity of a medical condition which would preclude Mr. Higdon from performing his job as Re-Inspect Finishing Operator.

The Court concludes that Sun Life's decision that Mr. Higdon could perform the substantial and material duties of this position was arbitrary and capricious because it is not supported by the evidence in the record. Sun Life's decision in this regard, and the underlying opinions of its medical consultants, seem to have been based upon the fact that Mr. Higdon's medical records did not identify an objective cause or illness underlying, what Sun Life termed, Mr. Higdon's many "subjective complaints." And, indeed, this is true. Although Mr. Higdon's doctors initially suspected that he suffered from multiple sclerosis, this diagnosis was not confirmed until after Mr. Higdon's appeal was denied.

However, in Calvert v. Firstar Finance, Inc., the Sixth Circuit faulted a disability insurance provider for relying upon the opinion of a retained consultant, who had not physically examined the plaintiff, in concluding that the plaintiff's subjective complaints were not severe enough to establish disability. 409 F.3d 286 (6th Cir. 2005). The court stated: "This [the retained medical consultant] concludes despite never having met or examined [the plaintiff], and despite the fact that [the plaintiff's treating physician], with a full understanding of the [the plaintiff]'s history...did not reach that same conclusion." Id. at 297. The court then noted: "There is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician. Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate." Id. at n.6.

Here, the physicians retained by Sun Life concluded that Mr. Higdon was not disabled because there was no diagnostic test result in his records which explained Mr. Higdon's self-reported symptoms. They seem to conclude that because he had been not diagnosed with a specific illness, his symptoms could not be so severe that they impaired his ability to work. Thus, Sun Life's consultants, like the consultant in Calvert, were questioning the credibility of Mr. Higdon's treating physicians; that is, in denying that Mr. Higdon was disabled, Sun Life's consultants were essentially taking issue with the symptoms and limitations that Mr. Higdon's physicians had observed and documented in their examination and treatment of him. Accordingly, the Court believes that the failure of Sun Life's consultants to examine Mr. Higdon before reaching their conclusions calls into question the reasonableness of both their opinions and Sun Life's reliance thereupon.

The Court is also guided by the Sixth Circuit's opinion in Elliott v. MetLife, in which the court concluded an ERISA plan's determination to deny benefits was arbitrary and capricious because the plan did not rely on "medical evidence that assessed [the plaintiff]'s ability to perform job-related tasks." 473 F.3d 613, 618 (6th Cir. 2006). In Elliott, the court faulted MetLife for failing to explicitly consider how an individual with the plaintiff's impairments could perform the specific duties of her occupation. The Court held that because Metlife had not addressed that issue, it could not be said that MetLife had given a "reasoned" denial of the plaintiff's claim. Id. at 619. Similarly, there is no suggestion in either of Mr. Higdon's denial letters that Sun Life considered how an individual with his suggested impairments could function as a Re-Inspect Finishing Operator.

Based on the above, the Court cannot conclude that Sun Life's decision to deny Mr. Higdon long-term disability benefits was either the product of a principled and deliberate reasoning process or based upon the substantial medical evidence in the record. In reaching this decision, the Court

13

has also taken into consideration the fact Sun Life failed to consider the SSA's finding of disability in reaching its own determination of disability and the fact that Sun Life was acting under a conflict-of-interest when it denied Mr. Higdon's claim because, under the Sun Life policy, it is both the decision-maker, determining which claims are covered, and also the payor of those claims. See, e.g., Glenn, 461 F.3d at 666-669; Calvert, 409 F.3d at 292-295.

## IV. CONCLUSION

For the foregoing reasons, the Plaintiff's motion for judgment on the record is **GRANTED** and the Defendant's motion for judgment on the record is **DENIED**. **IT IS SO ORDERED**.

cc: Counsel of Record